# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:16-CV-00146-GCM

| | |
|---|---|
| JERAMIE BARIDEAUX; <br> JONATHAN HARRIS, <br><br> **Plaintiffs,** <br><br> v. <br><br> CITY OF CHARLOTTE, *et al.*, <br><br> **Defendants** | ) <br> ) <br> ) <br> ) <br> ) <br> ) **ORDER** <br> ) <br> ) <br> ) <br> ) <br> ) |

**THIS MATTER** is before the Court on Defendants City of Charlotte and Chief Rodney Monroe's Motion for Summary Judgment (Doc. No. 31), Plaintiffs' Memorandum of Law in Opposition (Doc. No. 39), and Defendants filed a Reply brief (Doc. No. 44).

## I. BACKGROUND

This case arises from an encounter between Charlotte Mecklenburg Police officers ("CMPD") and the Plaintiffs in the parking lot of the Rodeway Inn motel located at 3601 Brookshire Blvd in Charlotte. On April 14, 2015, at roughly 10:30 p.m., Mr. Barideaux and Mr. Harris arrived at the Rodeway Inn located on Brookshire Boulevard. Once parked, Mr. Darryl Moffett entered the vehicle to let Mr. Barideaux and Mr. Harris listen and talk about music tracks.

The owner of the Rodeway Inn allowed CMPD officers regular access to the property and officers patrolled the property at least three times each day. The Rodeway Inn also maintained conspicuous signage stating that individuals not registered with the motel were not allowed on the property.

As he performed his zone check at the Rodeway Inn, Officer Wallin observed a dark colored Toyota Camry in the rear parking lot that was backed into a parking space with the lights on and the engine running. He drove past the vehicle and observed three occupants.

Prior to and as he was approaching the driver's side of the car, he noticed the three occupants making movements in the car and their hands going towards the floorboards and sides. Officer Wallin could smell the odor of marijuana as he approached the vehicle. He walked around the vehicle and approached the driver's side front window to talk with the occupants. With the window down, Officer Wallin could tell that the odor of marijuana was coming from inside the car. Plaintiff Jeramie Barideaux was the driver of the Camry, Plaintiff Jonathan Harris was the front seat passenger and Darryl Moffett was in the rear driver's side passenger seat.

Officer Wallin asked the driver for his license and registration and asked the occupants for their licenses. While at the driver's window, Officer Wallin requested backup at the scene because of the odor of marijuana and because he was a single officer with three vehicle occupants.

Officer Bodenstein heard the radio transmission from Officer Wallin requesting that another unit assist him at the Rodeway Inn with an "occupied suspicious vehicle" and responded to the request for assistance. As Officer Bodenstein arrived, Officer Wallin walked back to his car to run the licenses and check for outstanding warrants. He found that Mr. Moffett has several warrants for his arrest. Sergeant Gorrod arrived at the scene soon after Officer Bodenstein. Sergeant Gorrod and Officer Bodenstein both smelled marijuana when they approached the car.

Officer Wallin approached Mr. Barideaux and asked him to step out of the vehicle so he could speak with him. Once he stepped out of the vehicle, Officer Wallin asked Mr. Barideaux if

he had anything in the car such as drugs, knives, or guns. Mr. Barideaux said he did not. Officer Wallin asked Mr. Barideaux for his consent to the search his vehicle. Mr. Barideaux said there was nothing in the car and did not consent to the search. Officer Wallin then told Mr. Barideaux that because he smelled the odor of marijuana, he had probable cause to search the vehicle. Mr. Barideaux then put his hands up and allowed Officer Wallin to search his person. Officer Wallin did not find anything in the search of Mr. Barideaux.

Next, Officer Wallin walked to the front passenger side where Mr. Harris was seated in the vehicle and where Officer Bodenstein was standing. He asked Officer Bodenstein whether he smelled anything and Officer Bodenstein responded in the affirmative. Officer Wallin asked Mr. Harris to step out of the vehicle and asked Mr. Harris if he had anything on him. Mr. Harris said that he had a knife and raised his hands. Officer Wallin removed the knife and placed it on the hood of the vehicle and then he conducted a person search of Mr. Harris just like he conducted on Mr. Barideaux. Officer Wallin did not find anything else on Mr. Harris.

During his search of Mr. Harris, Officer Wallin saw that Sergeant Gorrod had placed marijuana on the roof the car. Officer Wallin learned that Mr. Moffett gave a baggie containing approximately seven grams of marijuana to Sergeant Gorrod. Officer Wallin got Mr. Moffett out of the vehicle and, based on both probable cause and consent, started searching him, finding a small baggie with a white powdered substance. Mr. Moffett told the officers that the bag's content was Molly (i.e. methylenedioxymethamphetamine). Officer Wallin placed Mr. Moffett in handcuffs while he completed the search. Officer Wallin then placed Mr. Moffett in the back seat of his patrol vehicle and activated his DMVR.

Officer Wallin returned to the Plaintiffs' vehicle and started searching it, starting in the back seat where Mr. Moffett was sitting. Officer Wallin found a small digital scale in between the seats on a little hump between the floor boards and found marijuana that had been broken up all over the floorboard. After searching the vehicle, Officer Wallin talked to Mr. Moffett. The DMVR audio from Officer Wallin's vehicle shows that after Mr. Moffett was advised of his rights, he acknowledged that he had the marijuana in a ball; that he began breaking it up when Officer Wallin arrived; and that's why there was marijuana on the floor of the car. (Wallin DMVR, 23:27:04-23:27:19, 23:36:20). Mr. Moffett also acknowledged that the scale and Molly were his, and that he had given Officer Wallin the wrong name when he was asked for his identification. During his deposition, Mr. Moffett confirmed that he had the marijuana, the "Molly" and a drug scale in his pockets and a beer in his hands as he walked to Mr. Barideaux's car from the motel room. Mr. Moffett also acknowledged that he had been smoking marijuana "all day."

At this point, after the drugs and scale were discovered, Mr. Barideaux and Mr. Harris were standing in front of Officer Bodenstein's vehicle. Officer Wallin asked Officer Bodenstein and Sergeant Gorrod to conduct secondary searches of Mr. Barideaux and Mr. Harris. Wallin asked for these back-up searches because he suspected a drug transaction involving the Plaintiffs and Mr. Moffett. Officer Wallin's belief was based on the discovery of the marijuana, Molly and drug scale; the time of night and the history of the hotel; the odor of marijuana; and his own prior knowledge/experience of drug transactions occurring in vehicles. (Wallin Depo., 82:6-18).

Officer Bodenstein searched Mr. Harris and Sergeant Gorrod searched Mr. Barideaux. This search included a search of Mr. Harris' groin area, which is consistent with CMPD training. Officer Bodenstein noticed during his search that Harris was clenching his buttocks. He reported

to Officer Wallin that Mr. Harris appeared to be clenching his buttocks as if trying to conceal something. Mr. Harris stated that he does not do drugs and wouldn't hide anything in his buttocks. No illegal items were found during this search.

Then, Officers Bodenstein and Wallin discussed doing a visual body cavity search of Mr. Harris to determine if he was hiding narcotics in his buttocks. Sergeant Gorrod, acting as the supervisor, approved the decision to conduct the visual body cavity search of Mr. Harris. Officer Wallin told Mr. Harris that the officers wanted to conduct a visual body cavity search of him in the privacy of one of the motel rooms. He told Mr. Harris that the cavity search would be conducted either in the motel room or downtown. Mr. Harris consented to the search in the motel room, stating "you're not going to find nothing. Okay, let's go."

Officer Wallin asked Britney Gibert, who had been staying at the Rodeway Inn with Mr. Moffett, whether she would allow them to use room 119 for the further search of Mr. Harris. Ms. Gibert handed the key to Officer Wallin, who used the key to access her hotel room to conduct the visual body cavity search of Mr. Harris.

While in the bathroom, Harris lowered his pants and underpants, bent over at the waist and spread his buttocks apart. Neither Officer Wallin nor Officer Bodenstein touched Mr. Harris and no contraband was found. The search lasted two minutes or less. They walked back outside and Officer Wallin asked Mr. Harris and Mr. Barideaux for their drivers licenses again so he could write down their information. Officer Wallin returned their licenses and told them they could leave.

Plaintiffs have filed fourteen claims in connection to the searches of their person by Officer Wallin, Officer Bodenstein, and Sergeant Gorrod (hereinafter collectively referred to as

"the defendant officers") on the evening of April 14, 2015. Plaintiffs have put forth five claims under 42 U.S.C. § 1983 and nine tort claims under North Carolina law, including intentional infliction of emotional distress, assault, felonious restraint, kidnapping, and "gross negligence and negligence" claims against each separate defendant.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence" in support of the non-movant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Unsupported speculation, however, is insufficient to defeat a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

## III. ANALYSIS
### a. Section 1983 Claims

Plaintiffs have named both the City of Charlotte as a party and its former police chief, Rodney Monroe, exclusively in his official capacity. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [of which the officer is an agent]." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

In Counts I-V of the Complaint, Plaintiffs allege the following claims under 42 U.S.C. § 1983: Unlawful Seizure, Unlawful Search on behalf of Plaintiff Harris, Unlawful Search on behalf of Plaintiff Barideaux, Conspiracy to Violate Civil Rights, and Failure to Intervene. (Doc. No. 1-1 at 13-15). Each closing paragraph of the first five claims refer to "the individual Defendants, jointly and severally," being held liable under § 1983. *Id.*

Given this vague phrasing for how these claims are being brought against the City of Charlotte and Chief Monroe in his official capacity, the Defendants in their summary judgment argument made the assumption that the Plaintiffs would allege municipal liability claims under section 1983 and presented arguments for dismissing the claims under this analysis. (Doc. No. 32 at 3-5).

However, the Plaintiffs in their opposition memorandum made it clear that they were instead alleging claims of supervisor liability under § 1983. (Doc. No. 39 at 5). The Plaintiffs' basis for holding the City and Chief liable is that "[a] police supervisor… may be held *individually* liable for a subordinate's constitutional violation." (Doc. 39, p. 5) (emphasis added.). The problem with this argument for establishing liability is that the Plaintiffs have not sued Chief Monroe in his individual capacity. The caption to this matter clearly states that the Chief has been sued "in his official capacity as a law enforcement officer with the Charlotte-Mecklenburg Police Department." There is a clear distinction between the position of the suit against the Chief and the suit against the three defendant-officers, who were sued in both their individual and official capacities. Thus, the Plaintiffs' section 1983 claims against Defendant Chief in his individual capacity necessarily fails.

In addition, it is unclear whether supervisor liability applies to municipalities under Fourth Circuit law. *See Moody v. City of Newport News, Va.*, 93 F.Supp.3d 516, 540 (E.D.V.A. 2015). But, even if this liability does apply to the City, the Plaintiffs have failed to allege sufficient evidence to create a genuine dispute for a supervisory liability claim against the City.

To establish supervisory liability, the Plaintiffs would need to show the following elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations omitted). The Plaintiff has a heavy burden of proof to establish the deliberate indifference for supervisory liability. *Shaw*, 13 F.3d at 799. Indeed, "[o]rdinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." *Id.* (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Deliberate indifference by a supervisor is shown by evidence that the supervisor failed to act "in the face of documented widespread abuses." *Slakan*, 737 F.2d at 372.

In support of their theory of liability, Plaintiffs assert that the City was "more than aware of multiple allegations and complaints filed against all three Defendant Officers regarding 'arbitrary profiling' and violations of 'arrest, search, and seizure.'" (Doc. 39, p. 6.). The Plaintiffs argue that this evidence creates a genuine dispute as to whether the Defendants have

8

acted with deliberate indifference of the risks created by the conduct of its officers for committing a constitutional injury like the one alleged to have been suffered by the Plaintiffs.

The record shows the following sustained allegations against the three Defendant Officers regarding arbitrary profiling and violations of arrest, search, and seizure: a sustained allegation against Sergeant Gorrod wherein an individual complained that Sergeant Gorrod "stopped and searched" this person "for no legal reason." (Doc. 39-1, pp. 6-7.).[1]

The evidence the Plaintiffs have presented of the three Defendant Officers engaging in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff amounts to one isolated incident involving Sergeant Gorrod. This incident was investigated by the City and, as a result of said investigation, he was suspended for eight hours without pay. (Doc. 39-1, p. 6.). So, even this one incident does not support the Plaintiff's argument that the City is deliberately indifferent to abuses by its officers. *See Carter v. Morris*, 164 F.3d 215, 219-220 (4th Cir. 1999) (finding that where an officer was involved in a prior incident, the police department investigated and decided to suspend the officer: "This incident thus does not support a conclusion that the City is deliberately indifferent to or condones improper behavior on the part of its officers. In fact, it shows just the opposite.").

It is clear to the Court that the record lacks any evidence supporting the Plaintiff's claim that the City of Charlotte was aware of conduct by its officers posing underlying risk of constitutional injury to citizens like the plaintiff. There is no genuine dispute as to whether the

---

[1] There is a second sustained allegation against Sergeant Gorrod arising from a warrantless entry, however that incident was not a search and seizure violation, but a CMPD rules violation for failure to notify a supervisor. (Doc. No. 44 at 5).

evidence provided meets the elements of supervisory liability under section 1983. So, Counts I-V of the Complaint are dismissed against the City of Charlotte as well as Chief Monroe.

### b. State Tort Claims

The Fourth Circuit has held that "a party's failure to raise an issue in a complaint or opposition to summary judgment constitutes a waiver of that issue. Indeed, '[e]ven an issue raised in the complaint but ignored at summary judgment may be deemed waived.'" *Estate of Weeks v. Advance Stores Co., Inc.*, 99 Fed.Appx. 470, 474 (4th Cir. 2004) (citing *Grenier v. Cyanamid Plastice, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995)).

In their memorandum of law in support of their motion for summary judgement, Defendants City and Chief presented arguments for why each of the state tort law claims that Plaintiffs brought against them should be dismissed.

The Plaintiffs failed to brief any of the state tort claims in their opposition memorandum. In their opposition memorandum the Plaintiffs did not even mention the state tort claims. After going through the facts of the case, the Plaintiffs only discuss the issues the Defendants raised on the Section 1983 claims. On that basis, the Court deems that the Plaintiffs have waived the issues presented by the Defendants City and Chief on the state tort claims and the Defendants City and Chief are entitled to summary judgment on those issues.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. All claims against Defendant City of Charlotte and Chief Rodney Monroe are hereby dismissed.

Signed: May 17, 2017

Graham C. Mullen
United States District Judge