# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:16-CV-00146-GCM

| | |
|---|---|
| JERAMIE BARIDEAUX<br>JONATHAN HARRIS,<br><br>**Plaintiff,**<br><br>v.<br><br>JOHN C. GORROD<br>MICHAEL R. BODENSTEIN<br>MICHAEL C. WALLIN,<br><br>**Defendant.** | **ORDER** |

**THIS MATTER** is before the Court on Defendant John Gorrod's Motion for Summary Judgment (Doc. No. 26), Defendant Michael Wallin's Motion for Summary Judgment (Doc. No. 27), Defendant Michael Bodenstein's Motion for Summary Judgment (Doc. No. 30), Plaintiffs' Memorandum of Law in Opposition (Doc. No. 40), and Defendants filed a joint Reply brief (Doc. No. 42).

## I. BACKGROUND

This case arises from an encounter between Charlotte Mecklenburg Police officers ("CMPD") and the Plaintiffs in the parking lot of the Rodeway Inn motel located at 3601 Brookshire Blvd in Charlotte. On April 14, 2015, at roughly 10:30 p.m., Mr. Barideaux and Mr. Harris arrived at the Rodeway Inn located on Brookshire Boulevard. Once parked, Mr. Darryl Moffett entered the vehicle to let Mr. Barideaux and Mr. Harris listen and talk about music tracks.

This location was previously operated as the Brookshire Inn and was the subject of a Consent Judgment and Permanent Injunction entered on February 28, 2011 by the Superior Court of Mecklenburg County, which found that the property at 3601 Brookshire Boulevard had been maintained and used for the purpose of nuisance activities, including repeated acts of violence, prostitution, and acts of illegal possession and sale of controlled substances by its customers. The effect of the Consent Judgment was to perpetually enjoin the then-owner of the property "and all other persons" from maintaining a public nuisance on the property.

The injunction included the implementation of a plan of nuisance abatement which included, among other things employing an armed security officer. But, at the time of this incident, the owner of the Rodeway Inn did not employ an armed security guard and allowed CMPD officers regular access to the property and officers patrolled the property at least three times each day. The Rodeway Inn also maintained conspicuous signage stating that individuals not registered with the motel were not allowed on the property.

As he performed his zone check at the Rodeway Inn, Officer Wallin observed a dark colored Toyota Camry in the rear parking lot that was backed into a parking space with the lights on and the engine running. He drove past the vehicle and observed three occupants. Officer Wallin parked next to the Camry on the vehicle's passenger side and got out of his marked police car.

Prior to and as he was approaching the driver's side of the car, he testified that he noticed the three occupants making movements in the car and their hands going towards the floorboards and sides. Officer Wallin testified that he smelled the odor of marijuana as he approached the vehicle. He walked around the vehicle and approached the driver's side front window to talk with the occupants. With the window down, Officer Wallin testified that he could tell that the

2

odor of marijuana was coming from inside the car. Plaintiff Jeramie Barideaux was the driver of the Camry, Plaintiff Jonathan Harris was the front seat passenger and Darryl Moffett was in the rear driver's side passenger seat.

Officer Wallin asked the driver for his license and registration and asked the occupants for their licenses. While at the driver's window, Officer Wallin requested backup at the scene because of the odor of marijuana and because he was a single officer with three vehicle occupants.

Officer Bodenstein heard the radio transmission from Officer Wallin requesting that another unit assist him at the Rodeway Inn with an "occupied suspicious vehicle" and responded to the request for assistance. As Officer Bodenstein arrived, Officer Wallin walked back to his car to run the licenses and check for outstanding warrants. He found that Mr. Moffett has several warrants for his arrest. Sergeant Gorrod arrived at the scene soon after Officer Bodenstein. Sergeant Gorrod and Officer Bodenstein both testified that they smelled marijuana when they approached the car.

Officer Wallin approached Mr. Barideaux and asked him to step out of the vehicle so he could speak with him. Once he stepped out of the vehicle, Officer Wallin asked Mr. Barideaux if he had anything in the car such as drugs, knives, or guns. Mr. Barideaux said he did not. Officer Wallin asked Mr. Barideaux for his consent to the search his vehicle. Mr. Barideaux said there was nothing in the car and did not consent to the search. Officer Wallin then told Mr. Barideaux that because he smelled the odor of marijuana, he had probable cause to search the vehicle. Mr. Barideaux then put his hands up and allowed Officer Wallin to search his person. Officer Wallin did not find anything in the search of Mr. Barideaux.

Next, Officer Wallin walked to the front passenger side where Mr. Harris was seated in the vehicle and where Officer Bodenstein was standing. He asked Officer Bodenstein whether he smelled anything and Officer Bodenstein responded in the affirmative. Officer Wallin asked Mr. Harris to step out of the vehicle and asked Mr. Harris if he had anything on him. Mr. Harris said that he had a knife and raised his hands. Officer Wallin removed the knife and placed it on the hood of the vehicle and then he conducted a person search of Mr. Harris just like he conducted on Mr. Barideaux. Officer Wallin did not find anything else on Mr. Harris.

During his search of Mr. Harris, Officer Wallin saw that Sergeant Gorrod had placed marijuana on the roof the car. Officer Wallin learned that Mr. Moffett gave a baggie containing approximately seven (7) grams of marijuana to Sergeant Gorrod. Officer Wallin got Mr. Moffett out of the vehicle and searched him, finding a small baggie with a white powdered substance. Mr. Moffett told the officers that the bag's content was Molly (i.e. methylenedioxymethamphetamine). Officer Wallin placed Mr. Moffett in handcuffs while he completed the search. Officer Wallin then placed Mr. Moffett in the back seat of his patrol vehicle and activated his digital mobile video recording ("DMVR").

Officer Wallin returned to the Plaintiffs' vehicle and started searching it, starting in the back seat where Mr. Moffett was sitting. Officer Wallin found a small digital scale in between the seats on a little hump between the floor boards and found marijuana that had been broken up all over the floorboard. After searching the vehicle, Officer Wallin talked to Mr. Moffett. The DMVR audio from Officer Wallin's vehicle shows that after Mr. Moffett was advised of his rights, he acknowledged that he had the marijuana in a ball; that he began breaking it up when Officer Wallin arrived; and that's why there was marijuana on the floor of the car. (Wallin DMVR, 23:27:04-23:27:19, 23:36:20). Mr. Moffett also acknowledged that the scale and Molly

4

were his, and that he had given Officer Wallin the wrong name when he was asked for his identification. *Id.*

At this point, after the drugs and scale were discovered, Mr. Barideaux and Mr. Harris were standing in front of Officer Bodenstein's vehicle. Officer Wallin asked Officer Bodenstein and Sergeant Gorrod to conduct secondary searches of Mr. Barideaux and Mr. Harris.

Officer Bodenstein searched Mr. Harris and Sergeant Gorrod searched Mr. Barideaux. This search included a search of Mr. Harris' groin area. Officer Bodenstein noticed during his search that Harris was clenching his buttocks. He reported to Officer Wallin that Mr. Harris appeared to be clenching his buttocks as if trying to conceal something. Mr. Harris stated that he does not do drugs and wouldn't hide anything in his buttocks. No illegal items were found during this search.

Then, Officers Bodenstein and Wallin discussed doing a visual body cavity search of Mr. Harris to determine if he was hiding narcotics in his buttocks. Sergeant Gorrod, acting as the supervisor, approved the decision to conduct the visual body cavity search of Mr. Harris. Officer Wallin told Mr. Harris that the officers wanted to conduct a visual body cavity search of him in the privacy of one of the motel rooms. He told Mr. Harris that the cavity search would be conducted either in the motel room or downtown. Mr. Harris in response stated "you're not going to find nothing. Okay, let's go."

Officer Wallin asked Britney Gibert, who had been staying at the Rodeway Inn with Mr. Moffett, whether she would allow them to use room 119 for the further search of Mr. Harris. Ms. Gibert handed the key to Officer Wallin, who used the key to access her hotel room to conduct the visual body cavity search of Mr. Harris.

While in the bathroom, Harris lowered his pants and underpants, bent over at the waist and spread his buttocks apart. Neither Officer Wallin nor Officer Bodenstein touched Mr. Harris and no contraband was found. The search lasted two minutes or less. They walked back outside and Officer Wallin asked Mr. Harris and Mr. Barideaux for their drivers licenses again so he could write down their information. Officer Wallin returned their licenses and told them they could leave.

Plaintiffs have filed fourteen claims in connection to the searches of their person by Officer Wallin, Officer Bodenstein, and Sergeant Gorrod (hereinafter collectively referred to as "the defendant officers") on the evening of April 14, 2015. Plaintiffs have put forth five claims under 42 U.S.C. § 1983 and seven tort claims under North Carolina law against the defendant officers, including intentional infliction of emotional distress, assault, felonious restraint, kidnapping, and "gross negligence and negligence" claims against each separate defendant.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence" in support of the non-movant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Unsupported speculation, however, is insufficient to defeat a motion

for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

## III.   ANALYSIS
### a. Section 1983 claims

The Plaintiffs' have brought five federal claims under 42 U.S.C. § 1983 against the Defendants. Plaintiff alleges claims for Unlawful Seizure, Unlawful Search on behalf of Plaintiff Harris, Unlawful Search on behalf of Plaintiff Barideaux, Conspiracy to Violate Civil Rights, and Failure to Intervene. (Doc. No. 1-1 at 13-15). The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. For instance, an arrest made in violation of a person's Fourth Amendment right to be free from unreasonable seizures, therefore, will give rise to a claim under 42 U.S.C. § 1983. *See, e.g.*, *Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974). These claims in this case arise from interactions between the Defendants and Plaintiffs that can be broken down as follows: (1) Officer Wallin's initial approach and interaction with Plaintiffs; (2) the initial searches of the Plaintiffs; (3) the second searches of the Plaintiffs; and (4) the Harris visual cavity search.

The officer defendants' motions for summary judgment come down to three issues: (1) whether Officer Wallin had reasonable suspicion to warrant the initial stop of the Plaintiffs, (2) whether the defendant officers had probable cause to conduct the initial search of the Plaintiffs, conduct a second search of the Plaintiffs, and conduct a visual body cavity search of Plaintiff Harris and (3) whether the claims against the Defendants should be barred by qualified immunity.

### i. *Terry* Stop

Despite the fact that the car in which the Plaintiffs were in was stopped at the time Officer Walin approached, the Court considers the encounter to be a *Terry* stop, instead of a voluntary encounter. *See U.S. v. Edwards*, 2014 WL 2048075 (W.D.N.C. 2014). Under *Terry v. Ohio* an officer must have specific and articulable facts creating a suspicion of criminal activity to support a traffic stop. 392 U.S. 1, 21 (1968). This type of detention does not require probable cause, however it does require something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. *See also, Whren v. United States*, 517 U.S. 806, 813 (1996), *U.S. v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997). The Fourth Circuit has explained that a reasonable suspicion analysis must consider the totality of the circumstances. *United States v. Brown*, 578 Fed.Appx. 195, 196-197 (4th Cir. 2014). Further,

> A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect. A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon. And multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient.

*Id.* (citing *United States v. George,* 732 F.3d 296, 299–300 (4th Cir.2013)). The Defendants claim that seven facts, taken together, provided Officer Wallin the basis for a reasonable suspicion of criminal activity: (1) the incident occurred at night, after 10:00 p.m., (2) the car was backed into a parking spot in the rear of a motel, (3) this area was known by the officers to be high in crime because of the 2011 consent judgment and regular patrol of the property, (4) Officer Wallin detected the odor of marijuana as he approached the vehicle, (5) the occupants remained in the car as Officer Wallin approached, (6) Officer Wallin observed movement from the occupants suggesting that their hands were moving around the bottom of the car, and (7) the driver, Plaintiff Barideaux's, hands were shaking.

In response, Plaintiffs argue that summary judgement is not appropriate because there is a genuine dispute about the following factors: whether Officer Wallin believed this location was a high crime area, whether an odor of marijuana emanated from the car, whether the occupants were moving around as Officer Wallin approached, and whether Plaintiff Barideaux was shaking. For these disputes to be truly genuine, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. 242.

The Court will first examine whether there was a genuine dispute as to whether Officer Wallin believed the location at issue to be a high crime area. This location was previously operated as the Brookshire Inn and was the subject of a Consent Judgment and Permanent Injunction entered on February 28, 2011 by the Superior Court of Mecklenburg County, which found that the property at 3601 Brookshire Boulevard had been maintained and used for the purpose of nuisance activities, including repeated acts of violence, prostitution, and acts of illegal possession and sale of controlled substances by its customers. (Consent Judgment, at ¶¶ 5-7). The owner of the property at the time of the Plaintiffs' April 14, 2015 encounter with CMPD officers allowed CMPD officers regular access to the property and officers patrolled the property at least three times each day. (Bobby Patel Deposition, 37:15-20; 20:15-1). Plaintiffs do not dispute these facts nor that Officer Wallin was aware of the Consent Judgment. Thus, Plaintiffs have not raised a genuine issue as to whether Defendant Wallin believed the location at issue to be a high crime area.

Next, the Court will consider whether there is a genuine dispute as to Plaintiff Barideaux shaking when Officer Wallin approached. Officer Wallin testified that during his initial interaction with Plaintiff Barideaux, he seemed nervous, his hands were trembling and he was breathing heavy. (Wallin Depo., 34:18-22 and 37:8). Plaintiff does not present sufficient

9

evidence to dispute this testimony. Plaintiff was unable to point to any evidence directly contradicting Officer Wallin's deposition testimony of his observations of Plaintiff Barideaux. Thus, there is no genuine dispute as to whether Officer Wallin observed Plaintiff Barideaux shaking during their initial encounter.

The Court now looks to the dispute raised by the Plaintiffs as to whether Officer Wallin observed movement by the car occupants. In Defendant Wallin's Motion, he says that "he noticed the three occupants making movements in the car and their hands going towards the floorboards and sides." (Doc. No. 28 at 4). Defendant Wallin testified that that as he approached the car he "could see movement in the car, meaning hands reaching down toward the floorboard area and sides." (Wallin Depo., 25:20-25). Plaintiffs point out that Defendant Wallin also testified what he observed was the three occupants' heads down, their shoulders moving and their hands were not raised where they could be seen through car window. (*Id.*, 26:1-19). The Plaintiffs appear to be objecting to whether Officer Wallin actually saw the hands of the three occupants of the car or if he only surmised where their hands were based on the movements of their hands and shoulders he observed. The Court does not find that the testimony cited to by the Plaintiff contradicts Defendant Wallin's stated observation of movement of the occupiers of the car. It is clear to the Court that Defendant Wallin consistently testified that he observed the occupants moving as he approached that car; through the windows of the car he saw their heads were down and their shoulders were moving and he surmised this meant their hands were moving as this is what occurs when one moves one's shoulders.

In addition, Plaintiff states that this shoulder movement alone could not be a basis for reasonable suspicion. The Court agrees with the Plaintiff, however, just because a factor could not by itself be a basis for reasonable suspicion, does not mean that it cannot be considered

10

together with other factors to create reasonable suspicion. *See Brown*, 578 Fed.Appx. at 197 (stating that "multiple factors may be taken together to create reasonable suspicion even where each factor, taken alone, would be insufficient.").

Finally, with regard to whether there was an odor of marijuana, both Plaintiffs testified in their deposition that there was none. Plaintiff Barideaux stated in his deposition that he "did not smell no marijuana in the back seat of the car." (Barideaux Depo. 21: 19-20). Plaintiff Harris testified at his deposition that he did not smell the odor of marijuana on Mr. Moffit and that neither he nor Mr. Barideaux used marijuana that night. (Harris Depo. 76: 5-15). All three officers testified that they smelled the odor of marijuana as they approached the vehicle.

The Defendants have provided the following evidence to show that the odor of marijuana was present. First, all three officers testified that they smelled the odor of marijuana emanating from the car. Second there was at least 21 grams of marijuana found in the car. (Gorrod Depo, 25:17-26:6; Moffett Depo., 25:18-21; Wallin Depo., 67:4-23, 76:5-7). Third, there were loose pieces of marijuana on the floorboard visible in plain view. (Gorrod Depo., p. 25:17-25; Wallin Depo., p. 75:10-16). Fourth, Mr. Moffett admitted that he had been smoking marijuana that day prior to getting into the car with the Plaintiffs. (Moffett Depo, 60:24-61:1). Fifth, Mr. Moffett stated that he was breaking up a ball of marijuana when Officer Wallin arrived. (Wallin DMVR, 23:27:04-23:27:19). These facts are undisputed by the Plaintiff.

The testimony of Plaintiffs Barideaux and Harris is directly contradicted by all of the undisputed evidence in this case outlined above. Even in the light most favorable to the Plaintiff, a reasonable jury could not find that the odor of marijuana was absent as the officers approached the Plaintiff's vehicle. Thus, the marijuana odor is not subject to a genuine dispute.

Officer Wallin observed Plaintiff's vehicle, which was occupied by three individuals, backed into a parking space in the rear parking lot of a hotel after 10:00 p.m. located in an area known for narcotics transactions. As Officer Wallin approached the vehicle, he observed movement from the occupants, detected an odor of marijuana, and observed at the driver's hands were shaking. The combination of these specific and articulable facts, when considered together, create a reasonable suspicion of criminal activity that justify the traffic stop.

### ii. Probable Cause

The Court will now examine the searches conducted by the defendant officers on the Plaintiffs. The legal inquiry begins with whether the defendant officers had probable cause to search. *U.S. v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004). "'Probable cause,' for Fourth Amendment purposes, means 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (quoting *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)). The question in these cases "is whether the totality of circumstances is sufficient to warrant a reasonable person to believe that contraband or evidence of a crime will be found in a particular place." *Humphries*, 372 F.3d at 659 (citation omitted). "Stripped to its essence, the question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a "reasonable ground for belief of guilt" that was "particularized with respect to the person to be searched or seized."" *Id.* at 657-58 (quoting *Maryland v. Pringle*, 124 S.Ct. 795, 800 (2003)).

Under North Carolina law, it is a crime to possess marijuana, N.C.G.S.A. § 90-95, or to possess marijuana with intent to distribute it. *Id.*

The Fourth Circuit has held that "the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." *Humphries*, 372 F.3d at 658. In *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002), the Fourth Circuit held "that the smell of marijuana emanating from a properly stopped automobile constituted probable cause to believe that marijuana was in the vehicle, justifying its search." *Humphries*, 372 F.3d at 658. Moreover, "[w]hile smelling marijuana does not assure that marijuana is still present, the odor certainly provides probable cause to believe that it is. Thus, when marijuana is believed to be present in an automobile based on the odor emanating therefrom, we have found probable cause to search the automobile." *Id.*

The following searches were conducted during the incident at issue: the initial search of Plaintiff Barideaux and the initial search of Plaintiff Harris conducted by Officer Wallin, the vehicle search, the secondary search of Plaintiff Barideaux conducted by Sgt. Gorrod, the secondary search of Plaintiff Harris conducted by Officer Bodenstein, and the visual cavity search of Plaintiff Harris conducted by Officers Bodenstein and Wallin.

Officer Wallin testified that (1) he detected an odor of marijuana when he first approached Plaintiff Barideaux seated in the Camry with the window down and (2) he smelled marijuana again, but this time with a stronger odor, when Barideaux exited the vehicle at Wallin's request. (Wallin Depo. 48:17-25). Wallin was able to particularize the odor of marijuana to Barideaux, who was the first occupant to exit the vehicle. (*Id.* at 47:1-13). This was sufficient evidence to constitute probable cause to conduct the initial search of Plaintiff Barideaux. *See, Humphries*, 372 F.3d at 658.

The person searches of Harris were also supported by probable cause. When Harris exited the vehicle at Wallin's request, Wallin noted a strong odor of marijuana emanating from him.

13

(Wallin Depo., 62:24-63:7). Officer Bodenstein also testified that when he first arrived at the scene and approached the vehicle, he detected an odor of marijuana coming from the Camry and that odor became stronger as he reached the passenger side, where Harris was sitting. (Bodenstein Depo., 30:12-31:12). Harris was the only occupant on the passenger side of the vehicle. (Harris Depo., 75:22-76:4). Accordingly, Officers Wallin and Bodenstein both particularized the odor of marijuana to Harris. Similar to the analysis of the initial search of Plaintiff Barideaux, this was sufficient evidence to constitute probable cause to conduct the initial search of Plaintiff Harris. *See, Humphries*, 372 F.3d at 658.

Officer Wallin ran the names of the three occupants and identified that Mr. Moffett had given him an incorrect name and had several warrants for his arrest. (Wallin Depo. 46:17-25). "Upon arrest an officer may search the person of the arrestee and the area within the arrestee's immediate control." *Illinois v. Lafayette,* 462 U.S. 640, 644, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983). The vehicle search revealed a small digital scale located in between the seats on the hump between the floor boards and marijuana that had been broken up all over the floorboard. The contraband was within the reach of all three of the vehicle occupants.

The secondary search of Plaintiff Barideaux conducted by Sergeant Gorrod was also properly based on probable cause for the same reasons as the initial search. In addition, Wallin asked Gorrod to conduct the secondary search after contraband was found during Wallin's search of the vehicle. (Wallin Depo., at 74:4-76:11). Under the collective knowledge doctrine, Gorrod's search of Barideaux was lawful because Wallin had sufficient information to lawfully search Barideaux again himself. *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) ("The collective-knowledge doctrine, as enunciated by the Supreme Court, holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had

sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer.").

The secondary search that Officer Bodenstein conducted on Harris was also properly supported by probable cause for all of the reasons previously discussed. Like Gorrod, Bodenstein conducted his person search of Harris based on Wallin's request after the discovery of drugs in the vehicle, and therefore, Wallin's probable cause analysis was imputed to Bodenstein pursuant to the collective knowledge doctrine.

The Court next turns to the visual cavity search of Mr. Harris conducted by Officer Bodenstein and Officer Wallin. The defendant officers first argue that Plaintiff Harris consented to this search. "Whether consent was voluntarily given is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). The defendant officers are required to "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances." *Id.* at 249. Regarding whether he consented to this search, Plaintiff Harris testified that "It wasn't an agreement; it was an ultimatum given to me. I didn't have a choice." (Harris Depo. 101:8-9). This testimony creates a genuine dispute as to the fact of Plaintiff Harris' voluntary consent. Thus, the Court resolves this dispute in favor of the nonmoving party and cannot find that Plaintiff Harris voluntarily consented to the visual cavity search.

The Fourth Circuit has established clear guidelines concerning the manner in which a visual cavity search must be conducted under the Fourth Amendment: (1) the search must be conducted in private, and (2) the reason for conducting the search must be compelling enough to

counterbalance "against the invasion of personal rights that such a search involves." *Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001). Accordingly, this Circuit has found the following strip searches unconstitutional:

- A strip search conducted in public, and involving physical penetration of the genitalia, of an arrestee charged with a noise violation, *Id.*;
- A strip search conducted in a holding room, with raised blinds, of an arrestee charged with DWI who showed no indication of possessing weapons or other contraband, *Logan v. Shealy*, 660 F.2d 1007, 1010 (4th Cir. 1981); and
- A strip search of a male arrestee performed in a utility room with the door open such that a female could view, which search appeared to have been conducted in retaliation for the arrestee's repeated request to make a phone call, *Abshire v. Walls*, 830 F.2d 1277, 1279-1280 (4th Cir. 1987).

Here, it is uncontroverted that the visual cavity search of Harris was conducted in the privacy of a motel bathroom with only Officers Wallin and Bodenstein, who were conducting the search, present with Harris. (Harris Depo. 102:7-23). It is equally uncontroverted that this search involved no touching by the officers and was completed in two minutes or less. (Harris Depo. 102:24-103:6, 104:1-3). The search was only conducted after the officers were able to particularlize their belief that illegal drugs were in Harris' possession and Officer Bodenstein perceived Harris to clench his butt cheeks during his person search. (Bodenstein Depo. 54:17-25). The clenching of butt cheeks is an indicator to Officers Bodenstein and Wallin of the concealment of drugs in that area. (Wallin Depo. 82:21-25; 86:25-87:7). The Supreme Court has recognized that a police officer, mistaken or not, may draw inferences based on his own experience in deciding whether probable cause exists. *Ornelas v. United States*, 517 U.S. 690, 700 (1996). ("To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel. An

appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.").

Since Defendant Wallin's initial encounter with Plaintiffs was properly based on reasonable suspicion and the officers' searches of Plaintiffs and of the vehicle were based on probable cause, there was no violation of Plaintiffs' Fourth Amendment rights and the defendant-officers are entitled to judgment as a matter of law on Plaintiffs' federal law claims against them. Since the qualified immunity arguments are rendered moot by this analysis, the Court will not reach them in this order.

   b. **State Law Claims**

Finally, the Defendants argue that they are entitled to summary judgment on the seven state law claims brought by the Plaintiffs based on public official immunity. A public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt. *Wilcox v. City of Asheville,* 222 N.C.App. 285, 287,730 S.E.2d 226, 230 (2012). To prove that a defendant acted with malice, the plaintiff must show that the defendant "wantonly d[id] that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa,* 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). In *Wilcox v. City of Asheville*, 222 N.C. App. at 292, 730 S.E.2d at 232 (2012), the Court emphasized that a "plaintiff may not satisfy her burden of proving that an official's acts were malicious through allegations and evidence of mere reckless indifference." "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Givens v.*

17

*Sellarsi*, 273 N.C. 44, 159 S.E.2d 530 (1968) (quoting *Everett v. Receivers*, 121 N.C. 519, 27 S.E. 991 (1897)).

The Plaintiffs have not presented any arguments that public official immunity does not apply in this case. *See*, Doc. No. 40. While the Plaintiffs arguments over the summary judgment motions for the Section 1983 claims may have touched on whether the defendants acted outside of the scope of their authority, more is needed to defeat public official immunity. The Plaintiffs must show that there is a genuine dispute that both the defendants acted outside the scope of their authority *and* they acted with malice or corruption. The Plaintiffs have not presented any evidence that a genuine issue of fact exists as to whether the defendant officers acted with maliciousness or corruption. Therefore, summary judgement is granted on all state law claims against the defendants.

Furthermore, the Fourth Circuit has held that "a party's failure to raise an issue in a complaint or opposition to summary judgment constitutes a waiver of that issue. Indeed, '[e]ven an issue raised in the complaint but ignored at summary judgment may be deemed waived.'" *Estate of Weeks v. Advance Stores Co., Inc.*, 99 Fed.Appx. 470, 474 (4th Cir. 2004) (citing *Grenier v. Cyanamid Plastice, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995)).

The Plaintiffs failed to brief any of the state tort claims in their opposition memorandum. In their opposition memorandum the Plaintiffs did not even mention the state tort claims. After going through the facts of the case, the Plaintiffs only discuss the issues the Defendants raised on the Section 1983 claims. The Plaintiffs have raised no issues concerning the applicability of public official immunity to this case. On that basis, the Court deems that the Plaintiffs have waived the issue of public official immunity applicability presented by the Defendants on the state tort claims and the Defendants are entitled to summary judgment on those issues.

## IV. Conclusion

**IT IS THEREFORE ORDERED** that Defendant John Gorrod's Motion for Summary Judgment (Doc. No. 26), Defendant Michael Wallin's Motion for Summary Judgment (Doc. No. 27) and Defendant Michael Bodenstein's Motion for Summary Judgment (Doc. No. 30) are **GRANTED**.

All claims against Defendants Gorrod, Wallin, and Bodenstein are hereby dismissed. The clerk of court is directed to close this civil case.

**SO ORDERED.**

Signed: August 8, 2017

Graham C. Mullen
United States District Judge